Council. Good morning, Your Honors. May it please the Court, my name is Myrna Beards, and I appear for I'm sorry, I can't hear you. Myrna Beards, and I appear for Appellant Jesus Buelna-Valenzuela. That microphone is primarily so we can get a recording of your argument. It doesn't do much in the way of You just need to talk a little louder. You got to talk loud. Okay. I will do that. Thank you, Your Honor. Your Honor, in Crawford, the Supreme Court held that testimonial statements violate the confrontation clause of the Sixth Amendment when they are, when the declarant has not been shown to be unavailable and the declarant has not been subject to cross-examination. The statements at issue in this case are testimonial statements, because there were statements made under circumstances that would, that an objective witness would reasonably believe would be available for trial later. But didn't someone, it was on the broadcast, right, is what you're talking about, and the yellow shirt on the broadcast. But later, didn't another agent come in and testify about the yellow shirt? Your Honor, there was That was in court? Yes. There was one agent who testified that he had a maybe five-second view of the person that was driving the load car, and he was wearing a yellow shirt. But that testimony by the in-court declarant was clearly bolstered by the fact that he, that the declarant, that Agent Garrett referred back to the broadcast of the person that was wearing a bright yellow shirt. Why don't we just stop one minute, because we have a group of students coming in. Thank you. All right. Let's let them sit down. Thank you. Give me back your time for a few seconds. The one was just as good as another. Neither one was very specific. And both of them put a guy with a yellow shirt who looked Hispanic in the same car. Why did it matter if there were two of them rather than one of them? Well, the important thing about Agent Garrett's, the in-court, the agent that testified in court, was that the circumstances under which he was able to It was very quickly, but he didn't claim to be identifying the guy. He didn't say, I could tell it was this person, any more than the first one did. He just said it was a guy with a yellow shirt, which is all the first one said. He did say that it was a guy with a yellow shirt. So what difference did it make? Well, I think that it did make a difference, because I think that they specifically relied throughout this trial about the person who saw the agent who had the clearer view. Well, I guess how did it affect the outcome of the trial? Let's assume that we buy everything about your argument up to the point of, you know, that it was testimonial. But how did it affect the outcome? Because the linchpin of the government's case was basically a guy with a yellow shirt was driving the car. He took the car to the stash house. Nobody other than a guy with a yellow shirt was seen leaving the house. That part doesn't have to do with this part, this radio transmission we're talking about, because the first radio transmission had to do with leaving the hospital and not getting to the house, right? That's right. All right. But the identification, that was the key identifying element of this person other than the male. The question is, what difference does it make that, as I understand, this is what I understand happening, and you can correct us, that first it came over the radio that a guy with a yellow shirt who looked Hispanic was getting in the car. And then, and that was the hearsay statement. And then the guy who heard it says, and I saw a guy with a yellow shirt who looked Hispanic in the car. So why does the first one matter? It might have mattered if there was any more specific identification, because the second guy, you know, barely saw him. But he saw him enough to notice those two things. So what difference does it make that there were two people who put a guy with a yellow shirt in the car instead of one? Again, I would go back to the way that the testimony was presented. I think that the agent who was the out-of-court declarant had the clearer view. I think that the agent who testified in court as to the guy with the yellow shirt did not have – he had an obstructed view. He did not have – How can you – how do you say that? What was obstructed about it? Because he was – he was parked in a hospital parking lot across the street from where – I mean, he was parked in a supermarket parking lot across the street from where the low car was parked. He may have been farther away from the fellow in the yellow shirt. That's right. And if I remember correctly, there was nothing in Agent Garrett's reports that indicated that he had seen this person in a yellow shirt. I think that all of this, if you read the trial transcripts, it leads one to believe that the out-of-court statement clearly was used to bolster and reinforce this fleeting glimpse of the one agent who did testify. So let me ask you about – if we did have to reach the issue of whether this was a testimonial statement, there are two cases currently pending in the Supreme Court dealing with what's a testimonial statement. One deals with a 911 call and the other one with some sort of investigatory statement, which might be similar to this. I don't know. I don't know the real facts. And I wonder if you've looked at them and whether it would make sense if we had – were going to reach this issue to hold the case for the Supreme Court. Yes, Your Honor. I think that although I didn't refer to those cases in our briefing, I think that they are relevant to this issue, although they are – those two cases are not on point. The two cases before the Supreme – which were argued before the Supreme Court both involved 911 calls which were admitted under an excited utterance. Both? I thought one was. Was they both that? Well, I'm – I could be wrong, but I'm sure that both of those cases involved 911 calls. So – and this – that's not that case. This is more a present sense impression case. In those two Supreme Court cases, there's also the issue – both of them involved domestic violence situations. But it would seem that your case would be closer to a 911 being a present sense than it would be to, say, a report. I agree, Your Honor. I think that the – Because the investigation is going on and they're broadcasting while it's going on. I agree with that, Your Honor. I think that both the excited utterance and the present sense impression go back to – well, they don't have the hallmarks of a formal interrogation, obviously, that the Supreme Court clearly identified in Crawford as being testimonial. There's also a temporal component to it, if you will, where the declarant, because they are observing something more or less as it's happening or just after it recently happened, you go back to their subjective intent in making the statement. In other words, do they intend to preserve the testimony or are they just expressing something as it's happening, either to ask for help or just for observation? But – and what the Petitioners in both those cases are arguing is that to get away from looking at the subjective intent of the declarant and just to say that any statement that is an accusatory statement given to law enforcement should be considered testimonial. And an accusatory statement would be a statement that describes a crime and or identifies the perpetrator. Does it make any difference, Your Honor, because the government says it does, that the fair clause statements, at least some of them were made before it was clear there was a crime? Well, I'd ask the Court to – Mr. Buona was convicted of both a conspiracy and possession of marijuana. Clearly, the conspiracy, the agreement to become involved in this preceded his getting into the car. So – and this case involved a co-defendant, a – the undercover detective and a confidential informant. Prior – apparently, prior to Mr. Buona's getting into the car, the co-defendant had paid the undercover agent for picking up the car. So at that point, there had been a crime committed. There had obviously been a conspiracy. There had been an agreement that Mr. Buona had agreed to participate in, and there was – at least the co-defendant certainly had – could have been prosecuted for possession of the marijuana based on those facts alone. Finally, can you quickly tell us what standard of review you think applies to the various statements here, plain error or harmless error, in terms of were there adequate objections made? The first statement, the guy in the yellow shirt, I think is harmless error. I agree with the government that the second statement is plain error because there were no – there was no objection made to that – to that admission, either a hearsay or a confrontational cause. So you're saying you think there was an objection made when the government brought in the statement that Faircloth made, when Garrett testified to that? Yes, Your Honor. Okay. But you're objecting on different grounds now, right? Well, I think there's different standards to prove, but I think both statements are testimonial. No, I think what – what – When you objected to the statement that you say you preserved, what grounds did you object on? That was on – it was just a hearsay objection. All right. But now you're raising a different objection, aren't you? Well, you're – yes, Your Honor, but I think that – Do you get to change that? Well, I think when – when the objection was made on hearsay grounds, that was under the Roberts regimen, which basically conflated the two, the hearsay rules equals the protections available on the confrontational cause. Because of the situation at that point, the objections were essentially the same. That's correct, Your Honor. Now, when Garrett was testifying as to what he saw, there was simply no objection at all, is that correct? There was an objection to the first – To what Faircloth had said. Yes. And then another agent testified to the same thing, but about the same statement. And there was no objection. About Faircloth's statement. Right. And there was no objection made, but the judge had just denied it. Okay. But on Milius, the third guy, there was no objection made. That's right, of any sort. Thank you very much. Very useful argument. Ms. Wood. I wanted to welcome, by the way, the group of students who are here today from the Christian Brothers School in Sacramento, Mucortine, 11th and 12th grade students. And the teacher is Mr. Greg Meegan, and the one, Ms. Mary Grade, who is an assistant unit attorney in the Eastern District is here with him as well. Thank you. They should have a child in the class. Good morning. May it please the Court. My name is Cynthia Wood. I'm the AUSA assigned to this case. The Court can join attempts by other circuits to define admissibility of hearsay evidence after Crawford, but it's not necessary in this case. Even if the disputed testimony was improperly admitted, the identical result would have been reached. Let's back up for a minute. There would be little point in us trying to define the testimony since the Supreme Court heard arguments, the testimony of exception, a couple weeks ago. Wouldn't it make more sense for us to just hear what the Supreme Court had to say if we thought it mattered? I think so. Do you know anything more about those cases in terms of what the issues were? No. I don't know. I don't have anything to add to what Ms. Beard says. It's essentially a correct presentation. Do you think they were both nine-one cases? Excuse me? Do you think they were both nine-one-one cases? I believe they were. I see. I'm not certain. Again, I'm not certain about that, but I believe that they were both nine-one-one cases. And the courts that have looked at nine-one-one have almost without exception held that the excited utterances do in fact apply. I mean, are in fact testimonial. They are in fact not testimonial. Okay. Almost across the board.  area, there's not nearly as much. Here you have an individual who's not a police officer. Here you have the police officers talking to each other. We have two police officers involved essentially in what amounts to statements between coworkers. This is surveillance. For the lack of a better term, it's surveillance chatter. What they are doing is in fact there are three statements at issue. And, again, I would agree with the defendant that one of them, they're reviewed for two of the three arguments reviewed for plain error. One is reviewed for harmless error. Initially, Agent Garrett's testimony was that there was an individual that he'd heard the observations made by Agent Faircloth. His testimony was subjected to that would be subject to the harmless error argument. But Agent Giacobbe was the second agent who testified. He testified that he'd also heard the observations of Agent Faircloth, but he's the guy that's across the street in the parking lot watching the car drive out. Again, there is overwhelming evidence. There's approximately the primary complaint is that the hearsay didn't make it. The overall evidence in the case, it seems to me, was not all that overwhelming because the guy was never actually identified. I mean, he was identified as somebody in a yellow shirt who looked Hispanic. It could have been that they could have changed his shirt at some point. I was a little surprised, frankly, that there wasn't a sufficiency of the evidence claim, but there wasn't one. But it certainly wasn't the strongest case in the world because nobody ever claimed to recognize this guy as such. There was, in fact, the last officer that testified, Agent Molina, the person who actually stopped the defendant, testified that that was, in fact, the person that he'd stopped on that day. Oh, that's different. I understand that. But at that point, the truck was empty. At that point we saw the person driving the loaded truck and identified it as him. Absolutely not. What it is, though, is it's a – what it is is we excluded, though, every other possibility. There's aerial surveillance. There's ground surveillance. No one – once that vehicle starts to pull out of the parking lot, it's observed over the air when it, in fact, is parked in the parking lot by a DEA agent. They know the car. They know the location. There's not an issue about that. It's observed, though, from the air and on the ground. There was testimony that it didn't stop, no one entered or exited the vehicle until it, in fact, reached the stash house where it pulls in. Again, there's testimony that a green truck pulls up and leaves, but when they stop the driver of the green truck, they say that's not the guy. When the Sunfire, again, leaves the car, the car that had originally – the load car that had driven the marijuana truck. The whole thing about the yellow shirt I thought was sort of funny. I mean, they could have changed shirts, for all we know. There's testimony that there was no shirt found in the house. And, again, there's testimony that there was nothing in the house except for the marijuana, the duffel bags, I think some food containers and some other minor things. There was specifically testimony from the agents who, in fact, sat through the night and watched the house. And none of this matters that much except to say that overwhelming is perhaps an exaggeration. So go ahead with the rest of the argument. The – well, the review specifically, again, the facts that demonstrate the defendant's guilt are that, one, it was a controlled delivery. There was – the DEA had obtained the marijuana. They knew the car. They knew the license plate. They knew the make. They knew the model. They knew where it was going. It was, in fact, delivered by an undercover agent. Agent Giacobbe testifies on direct evidence that he witnessed the person with the yellow shirt driving the vehicle. That was, in fact, his testimony. He's the agent that's across the street in the supermarket parking lot. There was nothing that obstructed his view, was there? I didn't recall any evidence of that. No. As a matter of fact, he stated that he had a clear view of the defendant as, in fact, he entered – as, in fact, he exited the hospital car. He just said it was like a glancing view or something. It was like five seconds or so. As the court can imagine, a car pulls up to the – pulls up to a street or it's exiting a parking lot. It pulls up to a street. It waits while the driver looks, presumably, before it pulls into traffic. Was the agent Faircloth's description any more specific than Agent Giacobbe's description? No. Basically the same description. Basically the same description. And, in fact, it's Agent Giacobbe, though. The car goes, goes to the stash house, drops off its marijuana, is leaving. It's Agent Giacobbe, though, who says, wait a minute. That's the guy that drove the car. That's the guy that drove it from the hospital. You need to stop him. And, in fact, that's when the vehicle stopped and the individual is, in fact, identified. They didn't want to stop the vehicle before it got to the stash house because they were hoping at that point to identify 1A, the stash house, and perhaps other co-conspirators involved in the case. Was Giacobbe cross-examined as to whether his perceptions were influenced by what he'd heard on the radio? He was cross-examined about what, but not specifically about whether or not his perceptions were influenced by what he heard on the radio. Again, it's a matter of seconds. There's a report. There are two actual statements by Agent Faircloth. There's a Hispanic guy in a yellow shirt. He looks like he might get in the car. At that point, he's walking through the parking lot. Nothing's happened. In fact, he does get in the car, and he pulls out, and that's where Agent Faircloth comes over the broadcast again. He says, hey, the guy got in the car, and he's pulling out. Well, at that, there's surveillance overhead. They're watching the guy back out of the space. Agent Giacobbe testifies that it's just a few seconds later when he's able to sit and say, oh, again, there's no question about what's going on. Okay.   Rieger?  I was going to follow up with Mr. Property. He was tried before or after Crawford? After. He was tried after? He was tried after Crawford. Well, first of all, that isn't what Ms. Biers just told us with respect to the question of the objection. She said that the objection was made the way it was because Roberts was the law at the time. That's not true? Ms. Biers wasn't trial counsel. I was. It was June, and so it was after Crawford. I see. But secondly, what I was going to say about that is the government would have been better off just putting Mr. Faircloth on the stand. There are a number of considerations. Agent Faircloth, again, it's a description of a Hispanic male wearing a yellow shirt. That's all you ever had. That's all Jack Colby said, too. Nobody ever said any more than that. But you have Garrett testifying to that because he, in fact, was present when the vehicle was, in fact, pulled over after it had left the house. Well, if this was after Crawford, was the initial objection sufficient to preserve that for harmless error? Because you can't keep thinking of better objections when the first one doesn't work. The purpose of an objection is to put everyone on notice of what the problem is so that the trial court can either, you know, can address that, but then you can't say, well, objection here, say, and then later say objection relevance on appeal. I think the Court is correct, and that may very well make that first objection subject to a plain error analysis as well, even though with the, I guess we start at the top and lower the standard, even under a harmless error analysis, though, still there's sufficient, more than sufficient evidence to show, to demonstrate the defendant's guilt, again, because it's overlapping in the sense that it is so rapid. We understand that it's a case of exclusion, but again, with no one in the house, the other, the only other individual that exited, entered and exited the house specifically excluded as the person who drove the car to the house. They watch it all day and they watch it all night. Did Mr. Wilma Valenzuela testify? No, he did not. Okay. He did make statements, though, that were testified about. When he was, in fact, stopped in the vehicle, the, he told the agents that, he told the, excuse me, the Department of Public Safety officer, well, I'm coming from visiting a relative at the North Hospital, and they have us going in that different direction. Based on where he was stopped? Couldn't have been. Based on the location and the direction he was traveling, he couldn't have been. He also said something about borrowing the car from a friend. It was his friend Eddie's car. We know there was testimony that was rented by the DEA. So any, the only statements that he made were, the only evidence that was presented from Mr. Wilma Valenzuela were that his statements at the time that he was stopped simply were not credible. The only other statements would be, the only other evidence involved in this case and there was none, essentially. There was no contradictory evidence presented on behalf of the defense. There was nothing that was presented that contradicted any of the government's, in fact, statements. There was no evidence regarding any other individuals who had entered or exited the car, the, either the car or the house. The agents were very clear about that. And again, they watched it for a long period of time. The issues in Crawford, though, are that this is, in fact, the issues that Crawford are specifically designed to prohibit are the use of ex parte examinations as evidence against the accused. That's not what we have in this instance. Your time is up. So why don't you wrap up? All right. Based on all of that, Your Honor, we would find that it's not formalized testimony, it's not custodial, it's not interrogation by a law enforcement, and although we've tried to give the court as good an examination as we possibly can of the law that's currently out there, it may be a better idea to wait until the Supreme Court actually rules on this. We would ask, however, that the court find that this, if the Crawford is, in fact, implicated, that any error involved in this case is harmless. Thank you very much. Cancel. We'll give you a minute in rebuttal. I agree with Ms. Wood that it may make more sense to wait until the Supreme Court's decisions in Davis and Hannon. I disagree with Ms. Wood when she asserts that the thrust of Crawford and what it was designed to do was to keep out ex parte sort of formal testimony. I think the thrust of Crawford was to reaffirm the common law right of each defendant to have live witnesses in court be tested under the crucible of cross-examination. And that's not – and that's precisely what did not happen in this case. This case was tried, I think it was, about – I think Crawford was decided in March. I think this case was tried in June. I think this Court has addressed under Bourgeulet about whether a hearsay objection is exactly the same as the protections afforded by the confrontation, by the confrontation clause, but obviously nothing has been addressed on that issue. So I think that it is another issue that the Court will have to address. I'm sorry. I'm not understanding what you're saying. It does have to do with the nature of the objection and whether – do we play an error homicidal? Yes. I think that that's another additional issue. And what is the case that you're talking about, Bourgeulet? What is that? I'm sorry. Bourgeulet was a co-conspirator statement that was admitted and the Supreme Court had said – this Court had said at that point that – But that was pre-Crawford. The question is whether – and she's right, I take it, about the fact that this was a post-Crawford trial, isn't it? That's correct. Okay. All right.
judges: Thompson, Berzon, Callahan